Lee Strong and Chicago Title & Trust Company, Complainants, v. Ben Friedman et al., Defendants.
In re Garard Trust Company, Receiver, for the Approval of its Current and Final Reports and Accounts, Appellant. Henry S. Lederman, Appellee.

Gen. No. 34,712.

Opinion filed May 19, 1931. Rehearing denied May 29, 1931.

Sonnenschein, Berkson, Lautmann, Levinson & Morse, for appellant; Ben Rothbaum and Bernard Nath, of counsel.

Wolfson & Fireman, for appellee; Harry J. Fireman, of counsel.

Mr. Presiding Justice Scanlan delivered the opinion of the court.

This is an appeal by Garard Trust Company, receiver, from an order disallowing certain items stated in its first and final reports and accounts.

The verified bill sought to foreclose a first mortgage trust deed securing an issue of bonds totaling $285,000 and prayed a partial foreclosure of the mortgage for nonpayment of interest and a principal prepayment. The mortgaged property consists of certain land and a six-story building located thereon, commonly known as 5218–5222 Kenwood avenue, Chicago. The building, an apartment hotel, contains 65 furnished apartments. Neither the trustee nor the bondholders had any mortgage or lien upon the furniture or personal property in the building. The receiver, appellant, was the actual owner of the five bonds which co-complainant Strong alleged, in the bill, he owned, and it also acquired other bonds secured by the trust deed as they became in default. Strong, an employee of appellant, was a mere dummy complainant. Appellant was, in fact, the complainant. Upon motion of complainants appellant was appointed receiver. The solicitors for Strong thereafter also acted for appellant. The bill made Ben Friedman, a bachelor, Ernest A. Hoerich, as Trustee, etc., Jacob S. Friedman and Reva Friedman, his wife, and the unknown owner or owners, etc., defendants. None of these parties answered or demurred to the bill. Albert Pick & Company held a chattel mortgage on the furniture and furnishings in the building, and after appellant took

possession of the premises the former commenced proceedings to foreclose the mortgage through the said solicitors, who, it appears, were its regular attorneys. Without informing the chancellor of the situation, Strong, acting for appellant, purchased the furniture and furnishings at the foreclosure sale for the sum of $23,000. $1,000 of this amount was then paid in cash to Pick & Company by appellant out of receivership funds, and Strong gave to Pick & Company a chattel mortgage on the furniture and furnishings for the balance, $22,000, payable in instalments of $500 each month, together with interest. The same solicitors represented Pick & Company in this matter. Thereafter, appellant, without authority from the chancellor, paid, from month to month, the chattel mortgage notes, which Strong had executed. The total sum paid, including the $1,000, was $5,096.25. The last payment was made in August, 1929. Henry S. Lederman, appellee, the owner of a junior mortgage, was not made a party to the bill, but on July 26, 1929, apparently by leave of court, he filed an answer to the bill. This answer did not make any charges of any kind against appellant. In September, 1929, appellant presented a petition which averred that Strong purchased the furniture at the chattel mortgage sale and that *he was "now the owner of all the furniture and furnishings located in said hotel"; that "Strong* has offered *to lease* the furniture and furnishings now located in said hotel to your petitioner *during the term of this receivership* at a monthly rental of $550." The petition alleged that it would cost in excess of $25,000 to purchase new furniture to replace the old, and appellant prayed that it be allowed *to pay to Strong a rental* of $550 per month for the furniture. No mention was made in this petition of the relationship of the several parties interested, nor were the true circumstances of the Pick transaction stated, nor was

the fact that payments had theretofore been made by appellant to Pick & Company on account of the chattel mortgage mentioned. Appellee filed an answer to this petition, in which he denies that Strong purchased the furniture and states that appellant "has been paying the sum of $550 per month upon said furniture to Albert Pick & Company, out of the moneys received by said Receiver from the rents, income and profits of the premises described in the bill of complaint on file herein, without the lawful authority of ' this court," and he questions the authority of appellant to purchase the furniture out of the rents and profits of the receivership property. In December, 1929, appellee filed a verified petition in which he avers "that he has recently discovered that the Garard Trust Company, a corporation, receiver herein, is the true and lawful owner of the various bonds and interest coupons sought to be foreclosed by the complainant herein; . . . that while said bill of complaint and supplemental bill of complaint aforementioned allege that Lee Strong is the owner of the principal bonds and interest coupons therein referred to, in truth and in fact, it will appear from an examination and investigation of the records of the Garard Trust Company, a corporation, that the said . . . Company is the actual owner of said principal bonds and interest coupons; . . . that through some pre-arrangement between said . . . Company, . . . who is acting as receiver herein, and Albert Pick & Company, a corporation, and the solicitors for the complainant herein, it was arranged to foreclose the chattel mortgage heretofore existing on the furniture and equipment in the premises described in the bill . . . and . . . it was understood and agreed that the complainant herein was to purchase the chattels referred to in said chattel mortgage, and that the receiver herein . . . was to pay Albert Pick & Company the sum of $500 per month out of the rents,

income and profits of the receivership premises'';
that pursuant to said prearrangement appellant paid
to Pick & Company several thousand dollars on ac-
count of the purchase price of said chattels; that the
chattel mortgage sale was held by Strong's solicitors
without the statutory notice in such cases made and
provided; that appellant is not a proper person to
act as receiver ''because of its diverse interest here-
in,'' and the petition prays that appellant be removed
as receiver and a new receiver appointed. Appellant
then tendered its resignation and the chancellor en-
tered an order accepting it and ordering appellant to
file its final account and report on or before Jan-
uary 20, 1930, and appointing Joseph H. Optner re-
ceiver. On January 25, 1930, appellant filed its final
report and account. Appellee filed objections to cer-
tain items in the first and final reports and accounts.
Upon a hearing the chancellor sustained objections to
the sum of $5,096.25 that had been paid by appellant
on account of the chattel mortgage notes executed and
delivered to Pick & Company by Strong, and also to
certain other items, and appellant was ordered to re-
cast its account. At the time of this hearing appellant
was in the hands of a receiver, and it appeared that it
had not turned over to the new receiver any of the
funds that belonged to the receivership, although it
had promised, some time before, to turn over at once
to the new receiver $8,000 or $9,000.

The only point raised by appellant is thus stated in
its brief: ''Appellant upholds payments of $5,096.25
on the furniture. . . . The only question before
this court is whether appellant is entitled to an allow-
ance for the moneys paid by it to Pick & Company.''

Appellant concedes that no order was ever entered
by the chancellor authorizing it to make the payments
to Pick & Company, and it further concedes that ''the
receiver should not have made payments with respect

to the chattel mortgage," and that it had no right to make such payments, but it claims that they were "authorized by Frank M. Hickok, formerly the trust officer, who thought that a court order had been obtained authorizing the payments." Appellant cites the familiar chancery rule that where it clearly appears that the court would have authorized an expenditure by the receiver had the order been applied for, it may do so subsequent to the making of the expenditure, and it contends that under this rule and the facts the chancellor should not have sustained the objection to the said payments. In considering this contention we must assume, under the evidence, that if the application for the order had been presented before the expenditures were made, appellant would have therein deceived the chancellor as to the facts. Even the averments in the petition of September 25, 1929, as we will hereafter show, were false and intended to deceive the chancellor. It would be a serious reflection on the honesty or intelligence of the chancellor to argue that he would have entered such an order had he been fully apprised of the actual situation and the real relationship of appellant to the suit. When the facts were brought to the attention of the chancellor by appellee, appellant, to prevent the entry of a removal order, resigned. At the time of the instant hearing the chancellor had before him the facts, and he expressed, in strong terms, his condemnation of the conduct of appellant in the premises. The argument, therefore, that he would have authorized the expenditures in question if appellant had applied for an order in reference to the same, seems an idle one. Moreover, an order obtained by fraud or deception would afford no protection to appellant. The cases cited in support of this contention can be readily distinguished, upon the facts, from the present case. In *Atwood v. Knowlson*, 91 Ill. App. 265, the expenditures were for taxes, insurance and necessary repairs,

In *Driever v. Shephard,* 259 Ill. App. 239, the receiver made disbursements in accordance with the provisions of the trust deed foreclosed, as well as in compliance with the prayer of the answer of the objector. In *Thompson v. Phenix Ins. Co.,* 136 U. S. 287, and in *Brown v. Hazlehurst,* 54 Md. 26, the receivers paid fire insurance premiums. In *Smith v. U. S. Express Co.,* 135 Ill. 279, the receiver was "empowered to institute suits in law or equity for the recovery of any assets," etc., and a suit was instituted and a recovery made by the receiver, and the court disposed of the "fruits of his litigation" and it was held that this amounted to a ratification of his act. In none of these cases was the good faith or honesty of the receiver questioned. Appellant also cites the rule that a receiver may exercise some discretion in certain matters relating to the care and management of the property in his custody, and it contends that this rule governs the instant question. In *Sprague, Warner & Co. v. Iowa Mercantile Co.,* 186 Iowa 488, 172 N. W. 637, cited in support of this contention, the court states that a chancellor may ratify certain acts of a receiver, performed without an order of the court, where it appears that "the officer has acted in good faith, and what he has done appears to have been beneficial to the parties interested." That case, upon the facts, is not similar to the instant one. There the receiver was ordered to conduct the business, and the litigation grew out of a contract that had been made for the purchase of merchandise for future delivery. "A receiver will not ordinarily be permitted to make any expenditures which will seriously diminish the fund intrusted to his charge, without the sanction and authority of the court, and it is his duty to apply to the court for instructions as to the expenditures." (High on Receivers, 4th Ed., sec. 798.) In *Hooper v. Winston, Trustee,* 24 Ill. 353, it appears that Hooper had been appointed receiver of a hotel, "to sell and dispose

of said property," and he incurred expenses amounting to $3,710.97 in the operation of the hotel prior to the sale of the same, and in his final account asked to be allowed this sum. The trial court disallowed it. The Supreme Court, in affirming the chancellor, said: "In the management of the McCardel House, although the receiver was required to keep it in operation until the sale, he had, as an officer of the court, but very little discretion allowed him, and should have applied to the court, by a brief petition, setting out the facts and asking for a reference, whether such and such expenditures would be for the benefit of the interested parties, and necessary to keep the house in operation, or for whatever other purpose the expenditure may have been desired. No single act, calculated to diminish seriously the fund, could the receiver do, on his own mere motion, and in the exercise of his discretion. The thing is unheard of, and the claim set up here to do so cannot be allowed. And he should have sold the property at the earliest practicable moment, so that keeping it in operation should not seriously have diminished the fund." In *Heffron v. Milligan,* 40 Ill. App. 291, Rice, the receiver, employed Milligan, a contractor, to repair a building and the latter estimated that it would cost between $4,500 and $5,000 to make the repairs. The receiver told him "to look through the hotel and see what repairs were needed, and put it in proper shape." Thereafter, on motion of the receiver, an order was entered allowing him to make repairs not to exceed $5,000. Prior to the entry of this order the contractor had made repairs, under the orders of the receiver, to the amount of $1,256.24. The trial court allowed the entire claim. This court reversed the order of the trial court as to the repairs that were made before the entry of the order. In the opinion the court said: "The general rule is well settled, that a receiver will not be allowed to incur liabilities for repairs against the estate in his hands, or be credited

with any outlays therefor which are not made by leave of court first applied for and obtained. The exception to the rule is, that his action may be approved by the court where repairs are made without permission if the sum expended or incurred is very small, or if it be shown that he acted in good faith and for the best interests of the property intrusted to him, or that it was necessary to act immediately, in order to prevent damage. Beach on Receivers, Sec. 282; High on Receivers, Sec. 798. This rule is recognized and applied in its utmost strictness in this State, as shown by *Hooper v. Winston,* 24 Ill. 353. . . . No exigency existed which justified proceeding with the work without authority. We see that no authority would have been given to proceed as was here done. Evidence of the justice and fairness of the claim is lacking. We are not disposed to relax the salutary rule that has been so often announced with reference to such unauthorized expenditures by receivers or trustees, and we have not the right to do so if we were so disposed. We cannot deal generously and accommodatingly with property in the hands of the court. In order to prevent lax administration, the temptation to which is so great, the rules which limit the discretion of officers of the court, the wisdom and propriety of which receive frequent demonstration but seldom more pointed illustration than in this case, must be rigidly enforced.'' We know of no Illinois case which would have justified the chancellor in ratifying the acts of appellant now under consideration. All the authorities recognize the fundamental principle of law that where an expenditure was made without leave of court the receiver must show, among other things, *that it was made in good faith and that the receiver was not guilty of any fraud or deception in connection with the same.*

Appellant, the complainant in fact, resorted to subterfuge and deception to have itself appointed re-

ceiver. As the chancellor stated, its conduct in that regard violated "the moral as well as the legal code" and constituted a fraud upon the court. Appellant, acting through its dummy, Strong, was the real purchaser of the furniture, and it partially paid for the same out of receivership funds under the guise of rents and without an order of court. There is much force in the contention of appellee that appellant was not an "amateur receiver whose experience and training may not have been such as to instill in his mind the sanctity of his office," and that its acts show bad faith and fraudulent intent. It is apparent from the evidence that if appellee had not filed an answer and opposed the actions of appellant, the latter, without an order of court, would have continued to pay Pick & Company, under the guise of moneys paid to Strong for rent for the furniture, the amounts due it under the chattel mortgage, and if that company had been paid in full, Strong, the tool of appellant, could then have claimed to be the owner of the furniture. It is significant that appellant, in its so-called offer of proof, made no offer to prove by anyone connected with Pick & Company that the latter, in its dealings with appellant, knew anything about the so-called rental scheme. Appellant states that it could not sign the chattel mortgage and notes and therefore it had Strong acquire the legal title to the furniture and sign the said instruments, but that "Strong will be glad and hereby formally offers to convey it to the second mortgagee, if he will assume the co-complainant Strong's liability for the balance due on the chattel mortgage which Strong executed so that the receiver might be able to use said furniture." This is an assertion by appellant that it still has the power to control Strong's actions. However, in the proceedings before the chancellor, Strong, personally, made no offer in respect to the furniture. It there developed that Pick

& Company was seeking to recover possession of the furniture from the new receiver, and one of appellant's solicitors (also a solicitor for Pick & Company) stated to the court that if Pick & Company was not paid in full it was "going to take their furniture."

Appellant states that as soon as it discovered that there was no order authorizing the payments to Pick & Company it filed its petition of September 25, 1929, and it contends that this petition shows its good faith in the entire matter. We think it shows, clearly, the bad faith of appellant. The facts relating to the relationship of the parties and the salient circumstances surrounding the entire matter now under investigation are not stated nor mentioned therein. The petition was *verified* and it avers that *Strong* purchased the furniture at the chattel mortgage sale and that *he* is now the owner of it; that *he* has offered to lease the furniture and furnishings to the receiver *"during the term of this receivership,"* at a monthly rental of $550, and it prays that it may be authorized to pay such sums *to Strong* "for the rental of the furniture and furnishings." No mention is made of the fact that the so-called rental plan was but a scheme to enable it to pay Pick & Company for the furniture, and that appellant had for months paid large sums of money to Pick & Company in furtherance of that scheme. The petition was worded in a way to convey the idea to the chancellor that appellant was informing him of a new proposition and asking his approval of the same, but its real purpose was to secure the approval of the chancellor not only for future payments, but for all payments made *"during the term of this receivership."* Appellant concedes that it acted "irregularly," but it insists that its intentions were honest. If the Pick transaction, sometimes called, by appellant, a rental plan, were an honest one, why did it persist, in this petition, in deceiving the court as to

the facts of the matter? Why did it countenance perjury in that document? Designed to obtain, by improper means, an order from the chancellor, the petition was but another fraud practiced upon the court. It demonstrates the bad faith and dishonesty of appellant and warranted contempt proceedings against it when the chancellor was apprised of the facts. The answer of appellee to the bill, filed July 26, 1929, as we have heretofore stated, made no charges of any kind against appellant. The petition of appellee in which he made the charges against appellant was not filed until December, 1929. Had it been filed prior to September 25, 1929, it is clear that the petition of appellant of that date would not have been presented to the chancellor. The mere filing of the December petition of appellee brought about the resignation of appellant.

From the very inception of this case appellant practiced deception, perjury and fraud upon the court. The verified bill alleges that Strong is "the legal holder of said interest coupons and bonds herein sought to be foreclosed," whereas appellant was the legal holder of said instruments and the real complainant. It would not have been appointed receiver had it not been for the fraudulent allegations of the bill. Instead of employing independent counsel, it had the same solicitors represent it as actual complainant and as receiver. It then permitted its solicitors to represent Pick & Company in the transactions relating to the chattel mortgage. It had its dummy, Strong, acquire the legal title to the furniture and furnishings, and under the guise of paying rent for the same it paid Pick & Company for the furniture out of the funds of the estate. In its reports and accounts and petitions it sought to deceive the court by false statements. In view of the record, it is surprising that the chancellor took no steps to punish it for contempt.

In their relations with chancellors, honest receivers are not compelled to resort to subterfuges, deceptions and perjury. Appellee contends, and with much force, that the actions of appellant in certain other matters also tend to show its bad faith in the administration of the receivership property. However, we do not deem it necessary to refer specifically to these other matters.

Appellant was appointed receiver on November 2, 1928. On June 18, 1929, it filed its first report and account, covering the period to April 30, 1929. On June 18, 1929, this report was approved by a chancellor other than the one who appointed appellant receiver and passed upon its final report and account. When the first report and account was approved, appellee had not filed his appearance in the cause and there was no party to raise objections to it. Appellant concedes that the approval of the first report and account was subject to review thereafter, but it contends that "in view of the fact, however, that appellant at all times acted in good faith and that the expenditures for the use of the furniture were beneficial to the estate and essential to the operation of the property, the Court should not have set aside the order approving the first report." The first report and account is a lengthy document. It contains the following: "Your Receiver further respectfully represents that it was obliged to cause a detailed inventory to be made of said furniture and fixtures, in order to satisfy the owner of said Chattel Mortgage, but found that numerous furnishings covered by said Chattel Mortgage were not on hand or had been used up through previous wear and tear; but that your Receiver was able to arrange with the owner of said Chattel Mortgage to allow the Receiver the use of said furnishings upon the payment of the sum of $500 per month, the same to be applied in reduction of the said Chattel Mortgage debt, and that

during the period covered by this First Account, your Receiver has been obliged to pay out on account of the use of said chattels the total sum of $3,000, as will more fully appear from the schedules hereto attached, *all of which said payments were duly made pursuant to an order of this Court dated December 4, 1928."* In the account, under the heading, "CASH RECEIPTS AND DISBURSEMENTS FROM ALL SOURCES AND FOR ALL PURPOSES FOR PERIOD FROM NOVEMBER 2, 1928 TO APRIL 30, 1929," appears the following item: *"Expenditures Under Special Orders: A-3 Chattels—Court Order Dated Dec. 4, 1928 $3000.00."* It is plain that the chancellor would conclude from the report and account that the expenditures had been specially authorized by a court order and he would therefore have no reason to inquire into the merits of the matter. The statement therein as to the arrangement made in reference to the furniture and furnishings was false, and was intended to mislead the court. The report does not tell the court that appellant bought the furniture in the name of its dummy, Strong, and that the legal title to the same was then in the name of the latter, who held it for appellant, and that the expenditures were made in payment of the chattel mortgage notes executed by Strong. Appellant claims that Hickok, its former trust officer, "believed that a court order had been obtained, and directed all of said payments under the mistaken belief that a court order had been obtained." During the hearing upon the final report and in its offer of proof, appellant failed, entirely, to state any facts upon which Hickok based his belief. Appellant makes the following significant concession: "How appellant's trust officer came to believe that an order had been entered on that date has never been explained." In view of the plain facts, the argument "that appellant at all times acted in good faith," and that therefore it must be assumed

"that he acted in good faith in his belief in the existence of such an order," is without force.

Appellant contends that the order appointing it receiver gave it the implied authority to make the expenditures in question. As the trust deed covered only the land and the building, there is no merit in this contention.

Appellant states that when the objections to its report were filed it asked that the reports and the objections be referred to a master, and that the court erred in denying its request. There is no warrant for this contention. The record shows that the first and final reports and accounts of appellant, and the objections thereto, came on to be heard before the chancellor, without objection, and that the chancellor proceeded to consider the various objections to the reports and accounts, and that after there had been several sessions of court, during which the chancellor took up with the counsel the various objections and stated his views in reference to the same, and after he had stated that he would not allow the payments made by appellant to Pick & Company, and had strongly denounced the conduct of appellant, the following occurred: "Mr. Levinson (solicitor for appellant): I would like to suggest this: *I would like to make a record with respect to the items of furniture.* I don't want to take your time. *Since your Honor has passed on it, it is almost a formal matter.* I *suggest* that we go before a Master and make formal proof. The Court: In the light of the court's holding, they will have to pay the expenses. Mr. Levinson: Perhaps we can make an offer of proof. I will make my record. Perhaps we will do that. We will come in with an offer of proof and draft order, let us say on Tuesday or Wednesday?" Appellant never made a motion for a reference to a master. It is clear that it abandoned even its suggestion to go before a master and

it subsequently came before the chancellor and presented a written offer of proof. Appellant suggested a reference only as to the Pick & Company payments and as there was no question of accounting involved therein, there was no necessity for a reference.

The record shows that appellant "presented an offer of proof, which, by order of court, was then and there refused," and appellant contends that the chancellor erred in this ruling, and it further contends that the facts set up in the offer of proof must be regarded as true and that it therefore must be assumed "that the expenditures made for the use of the furniture were highly beneficial, were reasonable, and were essential to the profitable operation of the hotel property." The so-called offer was presented in writing. Appellant did not call any witness or produce any documentary evidence in support of it. In *Chicago City Ry. Co. v. Carroll,* 206 Ill. 318, 328–9, the court said: "Appellant, in fact, offered no evidence upon the matter. No witness was put upon the stand; no question was asked. Nothing was done except a mere conversation or talk had between counsel for appellant and the court. Such procedure as that does not amount to an offer of evidence, and the remarks of the court did not amount to a refusal to admit evidence. There can be no refusal to admit that which has not been offered, and counsel cannot, by engaging in a mere conversation with the court, although it may relate to the procedure, by merely stating what he desires to do, get a ruling from the court upon which he can predicate error. *If appellant desired to make the contention it now makes, it should have at least put a witness upon the stand and proceeded far enough that the question relative to the point it is now said it was desired to offer evidence upon was reached, and then put the question and allow the court to rule upon it, and then offer what was expected to be proved*

*by the witness, if he was not allowed to answer the question asked."* (Italics ours.) In *Harman v. Indian Grave Drainage District,* 217 Ill. App. 502, 509, it was said: "This offer of proof was made before the court had ruled upon the objection to the question and was, therefore, premature. It is not proper to make an offer of proof until the court has sustained an objection to a question propounded for the purpose of eliciting the desired evidence." In *Stevens v. Newman,* 68 Ill. App. 549, the court said: "Appellants offered to prove the 'allegations of their petition.' This was insufficient. The witnesses should be called and questioned, or documentary evidence produced. A mere statement of an offer to prove is not anything upon which a court is called upon to act." (See also *Nelson v. Miller,* 195 Ill. App. 233, and *Lussky, White & Coolidge, Inc. v. Kennelly,* 261 Ill. App. 638 [Abst.].) The offer was made after the chancellor had decided that he would sustain the objections to the Pick & Company payments. It appeared during the proceedings that there had been other hearings and also conferences between counsel and the court and that the court and counsel were already familiar with the facts of the case. The material and controlling facts that bear upon the Pick & Company payments are not seriously disputed, and when these are considered, together with the admissions of record, the justice of the chancellor's ruling becomes evident. Moreover, the alleged facts stated in the offer would not warrant a change in the ruling. Appellant's protestations of good faith can have no weight when tested in the light of its entire conduct in this cause. In its reply brief appellant has seen fit to question the good faith of appellee and it apparently thinks that this subject should be considered in determining the instant question. It is a sufficient answer to this argument to say that the acts of appellant are the sole matter before us for consideration.

"A receiver is an indifferent person between the parties to a cause, appointed by the court to receive and preserve the property or fund in litigation *pendente lite,* when it does not seem reasonable to the court that either party should hold it. He is not the agent or representative of either party to the action, but is uniformly regarded as an officer of the court, exercising his functions in the interest of neither plaintiff nor defendant, but for the common benefit of all parties in interest. He should be a person wholly impartial and indifferent to all parties in interest. Being an officer of the court, the fund or property intrusted to his care is regarded as being in *custodia legis* for the benefit of whoever may finally establish title thereto, the court itself having the care of the property by its receiver, who is merely its creature or officer, having no powers other than those conferred upon him by the order of his appointment, or such as are derived from the established practice of courts of equity." (High on Receivers, 4th Ed., sec. 1.) "A receiver is frequently spoken of as the 'hand of the court,' and the expression very aptly designates his functions, as well as the relation which he sustains to the court." (Ib. sec. 2.) As a servant of the court he must be absolutely honest in the performance of all of his duties, and this rule demands that he practice the utmost fairness and frankness in all his dealings with the court. Due largely to the present great world-wide depression, there are, as we find upon inquiry, approximately 13,000 foreclosure suits now pending in the circuit and superior courts of Cook county, and the number is constantly increasing. Many banks have closed their doors. The number of business failures is very large. The courts must hold receivers to a strict account, or thousands of unfortunate people may be unjustly deprived of their interests in property that is in *custodia legis.* If the contention of

appellant were to be sustained, it would not be long before courts of chancery would be plagued with an evil and intolerable condition in receivership matters.

The order of the circuit court of Cook county should be and it is affirmed.

*Affirmed.*

GRIDLEY and KERNER, JJ., concur.