## M. Hommel Wine Company, Defendant in Error, v. Theo. Netter, Plaintiff in Error.

### Gen. No. 21,170.

1. SALES, § 329*—*when evidence sufficient to establish acceptance of goods.* In an action to recover the purchase price of wine sold and delivered to defendant, where the defense was that the wine delivered was not in compliance with the contract, and it appeared that defendant inspected the wine after delivery at the dock, that he afterwards refused to return the wine when requested by plain-

*See Illinois Notes Digest, Vols. XI to XV, and Cumulative Quarterly, same topic and section number.

tiff to do so, and took the wine from the dock, storing it in a warehouse and refilling some of the barrels and selling a large part of it, *held* that a peremptory instruction for plaintiff on the ground that the facts showed an acceptance with full knowledge of the condition of the wine was proper.

2. SALES, § 153*—*what constitutes an acceptance of goods.* Any act done by the buyer of goods tendered in fulfilment of a contract of sale, which such buyer has no right to do unless he is the owner of the goods, is itself an acceptance of the goods.

3. SALES, § 155*—*when acceptance of goods bar to claim for compensation for defects in goods.* The acceptance of an article sold on an executory contract after opportunity to examine it amounts, in the absence of fraud or latent defects, to an agreement that the article conforms to the contract and was satisfactory and bars all claim for compensation for defects in the article.

4. SALES, § 389*—*when damages on account of inferior quality of goods may not be recouped.* Where there has been an acceptance of goods delivered under an executory contract, damages on account of the inferior quality of the accepted goods cannot be recouped, in the absence of fraud or express warranty, or of latent defects incapable of discovery on inspection.

5. SALES, § 329*—*when not necessary to prove that goods correspond with sample or description.* In order to recover the purchase price of goods sold and delivered under a contract, it is not necessary to prove that the goods delivered exactly corresponded with the sample or with the description thereof in the contract where it appears that defendant received and retained the goods actually delivered, since the law does not permit a vendee to receive and retain the goods delivered under a contract, and afterwards defeat an action for the purchase price on the ground that such goods were not of the exact quality or description called for by the contract.

6. SALES, § 146*—*what is remedy of purchaser of goods not complying with contract.* Where goods tendered in performance of a contract are not in compliance therewith, the remedy of the vendee, in the absence of a warranty, is to refuse the goods, or to return them within a reasonable time after he discovers that they are not as required by the contract.

7. SALES, § 356*—*when evidence as to loss of profits properly excluded.* In an action to recover for wine sold and delivered, where defendant sought to set off or recoup profits alleged to have been lost as a result of the alleged inferior quality of the wine delivered, the exclusion of evidence of such profits *held* not erroneous, it appearing that defendant's conduct amounted to an accept-

*See Illinois Notes Digest, Vols. XI to XV, and Cumulative Quarterly, same topic and section number.

ance of the wine with full knowledge of its condition when delivered, and there being no evidence that defendant had a contract for the resale of the wine at the time of making the contract sued on.

8.   DAMAGES, § 61*—*when loss of anticipated profits from resale of goods not recoverable.* The loss of anticipated profits from a resale of the goods bought because of defects in the goods is not the measure of damages in an action against the vendor for breach of the contract of sale unless the vendor knew that the vendee had a contract to resell at an advanced price, and that the purchase was made to fulfil such contract.

Error to the Municipal Court of Chicago; the Hon. HARRY M. FISHER, Judge, presiding. Heard in the Branch Appellate Court at the March term, 1915. Affirmed. Opinion filed January 11, 1916.

## Statement of the Case.

On August 20, 1913, the plaintiff, a corporation, having its principal office at Sandusky, Ohio, commenced an action of the fourth class in the Municipal Court of Chicago against defendant to recover the purchase price, and interest thereon, of certain Catawba wine sold and delivered to defendant, viz.: 43 barrels (2217½ gallons) from cask No. 8, and 17 barrels (873 gallons) from cask No. 7. Plaintiff alleged in its amended statement of claim, *inter alia,* that said 60 barrels of wine were received by defendant and accepted by him. The defendant in his affidavit of merits alleged, in substance, that plaintiff represented that the wine should be like certain samples submitted and should be a good and merchantable wine; that the wine shipped was not like the samples submitted and was not as represented, but was acetic, unsound and decomposed and not fit for human consumption and of no value or use whatsoever; and that defendant refused and still refuses to accept the wine. The defendant also filed a claim of set-off for damages for loss of profits and for expenses incurred in hauling and storing the wine, etc. The case was tried before a jury on November 13, 1914, and at the conclusion of all the

*See Illinois Notes Digest, Vols. XI to XV, and Cumulative Quarterly, same topic and section number.

evidence the court, over the objection of the defendant, instructed the jury as follows: "I have come to the conclusion that this is a case where the defendant, having purchased the wine by description and sample without any express warranty as to its condition, and having had ample opportunity to inspect it when he received it, and having inspected it and accepted it and failed to return it, cannot defend at this time in an action for the purchase price, and your verdict should be for the plaintiff for the amount of the purchase price." Accordingly the jury returned a verdict finding the issues against the defendant and assessing plaintiff's damages at the sum of $986, and subsequently, on December 5, 1914, the court entered judgment on the verdict against the defendant, which judgment the defendant by this writ seeks to reverse.

The following facts, in substance, were disclosed by the evidence: Prior to March 7, 1913, plaintiff's salesman, McNally, submitted to defendant at Chicago certain samples of wine, and afterwards, on March 7th, defendant signed a written order wherein he directed plaintiff to ship him at Chicago, *f. o. b. Sandusky, Ohio,* about 2174 gallons of "pure catawba wine", to be taken from cask No. 8 in the wine cellar of plaintiff at Sandusky, at the price of 33 cents per gallon. It was mentioned on the face of the order that defendant would furnish cooperage for which he was to be allowed 3 cents per gallon. On May 5, 1913, defendant signed another written order wherein he directed plaintiff to ship him at Chicago, *f. o. b. Sandusky, Ohio,* about 1000 gallons of "dry Catawba" from plaintiff's cask No. 7, at 33 cents per gallon. It was mentioned in the order that the amount of wine to be shipped "by boat with balance" should total 60 barrels and that defendant should be allowed 3 cents per gallon on cooperage. Before said order had been accepted by plaintiff the defendant, on May 12th, wrote plaintiff in part as follows: "I have ordered cask

# 8, containing about 2174 gals., and the balance of the car with cask # 7, about 1000 gals., at 33¢ per gal., we to be allowed 3 cts. per gal. by furnishing our own cooperage. The cooperage was understood to be f. o. b. Chicago. * * * If you desire to fill this order like samples, kindly let me know by return mail so I can make shipment of cooperage. * * * We wish our own cooperage used." On May 16th plaintiff wrote a letter in reply, in part, as follows: "Everything is satisfactory to us but the barrels. We do not intend to pay freight from Chicago to Sandusky and allow you 3¢ for cooperage besides. * * * We are today expressing you sample of the wine as it is in the cask. Of course, when we ship it it will be filtered nice and clear. * * * If sample is satisfactory you can ship your barrels at once, and we will make immediate shipment by boat." On June 12th defendant wrote plaintiff: "The empty bbls. will go forward tomorrow. * * * You understand this wine must be like samples—about 2174 gals. from cask No. 8 and the balance from No. 7," and on June 16th he again wrote plaintiff: "All the empty bbls. have been shipped now. * * * Please send me the paid freight expense bill on same." The testimony of several of plaintiff's witnesses disclosed that after defendant's barrels had been received by plaintiff the same were cleaned, steamed and sulphured and put in proper condition to receive the wine; that 43 barrels were filled with wine taken from plaintiff's cask No. 8, and 17 barrels with wine taken from plaintiff's cask No. 7; that the wine so taken corresponded with the samples previously taken from said casks and submitted to defendant; that the wine before being put into the barrels was properly filtered and was pure Catawba wine, of good taste and free from foreign substances and acetic acid, and that the barrels were taken to the dock at Sandusky and shipped by water to defendant via Anchor Line, as requested. Plaintiff's evidence

as to the condition and quality of the wine in the barrels *at Sandusky,* and as to it being the same *at Sandusky* as the samples previously submitted, was not disputed.    The defendant, an. experienced dealer in wines, testified, in substance, that he first saw the barrels of wine in the first part of July, 1913, at the Anchor Line dock in Chicago; that a day or two after the wine arrived he opened about 10 barrels at the dock and took out some of the wine and tasted and inspected it and compared it with the samples previously submitted; that the wine was not as good as the samples, and was not palatable, contained acetic acid, and was unfit for consumption as wine.    On July 11th defendant wrote plaintiff to the effect that the wine had been found upon inspection not to correspond with the samples submitted and that he would expect plaintiff to send him wine like the samples.    To this letter plaintiff on July 14th replied, expressing surprise and saying that plaintiff could not furnish any different wine than that shipped, as that wine was taken from the same casks as the samples previously submitted and was the same wine, and further saying: "Let us hear from you by return mail what you propose to do, and if you do not accept it, the writer" (W. H. Hommel, secretary and treasurer of plaintiff) "will come to Chicago and attempt to sell it elsewhere and return you your barrels, and we will be out our labor of cleaning, steaming and sulphuring your barrels."    Not hearing further from defendant, plaintiff, on July 17th, and again on July 18th, wired defendant requesting a definite reply to plaintiff's letter of July 14th.    No reply being received to either the letter or the telegrams, W. H. Hommel, about July 20th, left Sandusky, came to Chicago and called on defendant at his place of business.    At this interview, according to Hommel's uncontradicted testimony, defendant said that the wine was not the same as the samples and Hommel insisted that it was.    Hommel proposed that plain-

tiff take it and dispose of it elsewhere but defendant refused to accede to this. Hommel then said that defendant would have to pay for the wine, to which defendant replied that he would not do that and that plaintiff had better go ahead and sue him. Hommel then proposed that he and defendant together go and inspect the wine and see how it compared with the samples, but defendant refused to do this or to inform Hommel where the wine then was, and thereupon the interview ended. The defendant further testified that some days after he had opened the 10 barrels at the dock he removed all of the barrels to a basement warehouse of a friend of his, where he opened 7 or 8 other barrels and inspected and tasted the wine therein contained, and that 8 or 9 days afterwards, about July 23rd, he took certain samples of the wine drawn from different barrels, which in the meantime he had kept in his office, to a consulting chemist, named Norton, who examined and tasted the same and made a report to defendant. This chemist was one of defendant's witnesses at the trial and he testified to the effect that the samples of wine so submitted to him at that time contained acetic acid, and that the wine was not palatable, had a tart, sour taste and was almost vinegar, and had no value as wine but only would have a value when it would become vinegar. On July 30th defendant wrote plaintiff, in part, as follows: "I employed a consulting expert to examine the wine and he pronounces it inferior and unmarketable and not the same wine as the sample I bought by. Now, I demand that you send me within 10 days from this date the exact kind of wine I bought from you and if you do not, I shall expect you to compensate me for the loss I will have sustained by your failure so to do." To this letter plaintiff replied on August 1st, in part, as follows: "If you mean to accuse us of sending you a different kind of wine than what we sold you, you have

got the wrong bull by the horn.  *  *  *  We have sent you nice, pure Catawba wine.  *  *  *  You will not have to wait 10 days.  *  *  *  We want your reply by return mail whether you want this wine, or whether you will give it up to us for further disposal.  We will take it off your hands without any expense to you whatever and will gladly return your barrels when they are empty.  We will also pay the freight which we have already done on your barrels from Chicago to Sandusky, and more than that we will not do.  *  *  *  You can wire us at our expense what you intend to do.''  And on August 2nd defendant wrote plaintiff acknowledging receipt of plaintiff's letter of August 1st, and saying in part: ''In view of your attitude, I shall have only one alternative left, for it is very evident from your letter that you are not desirous of either sending me the goods I ordered, or to compensate me for the loss and damage I will suffer by your failure.  The damage accruing to me from your failure to send the quality ordered on the 3090½ gallons of wine is, approximately, $772.50.  *  *  *  I have come to the conclusion that *I will be justified in selling* the inferior wine you have sent me at the very best price I can obtain for the same, and I will apply the proceeds from this on account of the amount you owe me, approximately, $772.50.  *  *  *  I trust you will either send me the wine I ordered, or a check in the amount of $772.50 at your early convenience.''  Seemingly, no further letters passed between the parties, and on August 20th plaintiff commenced the present action.

On cross-examination the defendant testified, in substance, that shortly after the wine arrived in Chicago and he had inspected it he made up his mind that he could not take the wine and sell it as wine; that he afterwards had the expert, Norton, test the wine shipped and the samples previously submitted, for the purpose of obtaining proof that the wine was not good wine and was not the same as the samples previously

submitted; that he afterwards ascertained that the wine had no value to him because he could not sell it; that the wine was stored in a warehouse; that he did not know exactly whether or not all of the 60 barrels had been opened; that he had refilled some of the barrels with wine taken from the other barrels; that he did not have all of the 60 barrels of wine on hand; and that he had disposed of some of the barrels of wine by selling them "for cash to pay the storage." On redirect examination he testified that he had sold about 18 barrels of the wine, all from cask 7, "ninety days ago."

Defendant further testified that in making the purchase of the wine he had intended to carbonate or charge it, and to put the carbonated wine in cases containing pint or quart bottles, and that ordinarily about 20 of such cases of wine could be procured from one barrel. He offered to prove that his net profit on each case of carbonated wine would have been $2, or on 1200 cases a total net profit of $2400, but the court would not allow him to so testify.

BENJAMIN F. J. ODELL, for plaintiff in error.

SCOTT, BANCROFT & STEPHENS, for defendant in error; JOHN E. MACLEISH, of counsel.

MR. PRESIDING JUSTICE GRIDLEY delivered the opinion of the court.

There is no dispute as to the quantity of the wine received by defendant or as to the total purchase price thereof. No point is made as to the verdict being excessive in amount on the ground that interest on said purchase price was included in the verdict. The main contention of counsel for defendant is that the trial court erred in directing a verdict in favor of plaintiff in any amount.

After due consideration of all the evidence we are of the opinion that the court's action in directing a

verdict in favor of the plaintiff was proper. We think that the evidence clearly shows that the wine, after its arrival in Chicago, was inspected by the defendant and with full knowledge of its condition was accepted by him. While he at first notified plaintiff that he would not accept the wine because he claimed that the same was not like the samples. previously submitted to him, yet he afterwards refused to return the wine to plaintiff when requested so to do, and took the wine from the dock and stored it in a warehouse, and afterwards refilled some of the barrels and also sold a large portion of the wine. "Any act done by the buyer of goods tendered in fulfillment of a contract of sale, which he would have no right to do if he were not the owner, constitutes, of itself, an acceptance of the goods." (*Wolf Co. v. Monarch Refrigerating Co.,* 252 Ill. 491, 502.)  In *Barker v. Turnbull,* 51 Ill. App. 226, 229, quoted with approval in *McLeod v. Andrews & Johnson Co.,* 116 Ill. App. 646, 649, it is said: "This court held in *Eureka Cast Steel Co. v. Morden Frog Works,* 23 Ill. App. 591, that, in the absence of fraud or latent defects, the acceptance of an article sold upon an executory contract after an opportunity to examine it, amounted to an agreement that the article conformed to the contract and was satisfactory, and barred all claim for compensation for defects existing in the article.  Where there has been an acceptance after an opportunity to inspect the goods delivered under an executory contract, damages because of the inferior quality of the accepted goods cannot be recouped in the absence of proof of fraud, or express warranty by the vendor, or of latent defects incapable of discovery on inspection." In the instant case the evidence clearly discloses that the wine was sold by samples, upon which samples the defendant relied, that there was no express warranty upon which defendant relied, that the defendant had ample opportunity to inspect the

wine after it was received, that there were no latent
defects in the wine incapable of discovery on inspec-
tion, and that no fraud was practiced by plaintiff on
defendant.   In the case of *America Theatre Co. v.*
*Siegel, Cooper & Co.,* 221 Ill. 145, the defendant gave
a written order to plaintiff for the delivery to defend-
ant at a price named of a certain number of opera
chairs, "same as sample shown" and "backs to be
upholstered in red plush, same quality as sample sub-
mitted."   Plaintiff delivered the chairs and subse-
quently brought suit against defendant for the pur-
chase price. On the trial at the close of all the evidence
the court instructed the jury to return a verdict in
favor of plaintiff for the full purchase price of the
chairs, upon which verdict judgment was entered.   It
was contended that this action was erroneous in that
plaintiff had failed to prove that the chairs delivered
complied with the description contained in the order
and that the chairs were of the same quality and
description as the sample exhibited to defendant.   In
affirming the judgment our Supreme Court said
(p. 147):

"The evidence offered by appellee showed that
the chairs which were delivered were 'K. D.' opera
chairs, with iron frames and upholstered backs, and
that appellant received and retained them and had
them set up in its opera house for use.  With this proof
in the record it was not necessary for appellee to
prove that the chairs exactly corresponded with the
sample or with the description contained in the con-
tract.   The law does not permit a person to receive
goods under a contract, appropriate them to his own
use, and then defeat an action for the purchase price
on the ground that the goods were not of the exact
quality or description called for by the contract.   His
remedy, in the absence of a warranty, is to refuse to
accept the goods when delivered, or to return them
within a reasonable time after the departure from the
terms of the contract is discovered."

It is also contended that the trial court, in connection with defendant's claim of set-off or recoupment, erred in refusing to admit in evidence defendant's offered testimony relative to his alleged loss of profits. Under the facts of this case and for reasons above stated we do not think that the court erred. Furthermore, the loss by a purchaser of goods of anticipated profits from a resale of the goods because of defects therein is not the measure of damages unless the seller knew that the buyer had an existing contract to resell at an advanced price, and that the purchase was made to fulfil such contract. (*Rhea Implement Co. v. Racine Co.*, 89 Ill. App. 463.) There was no evidence that the defendant, at the time he purchased the wine, had an existing contract with any one to resell the wine at an advanced price, and there was no evidence introduced or offered that defendant had lost any actual profits, as distinguished from probable or speculative profits.

The judgment of the Municipal Court is affirmed.

*Affirmed.*