**Foley and Company, Appellee, v. Excelsior Stove & Manufacturing Company, Appellant.**

**Gen. No. 8,569.**

80

Heard in this court at the October term, 1931. Opinion filed February 1, 1932.

HARTZELL, CAVANAGH & MARTIN and C. H. WOOD, for appellant.

ROSENBERG, CORLETT & TOOMIN and M. FINLAY CAR-ROTT, for appellee.

MR. JUSTICE SHURTLEFF delivered the opinion of the court.

Appellee brought a suit in assumpsit against the appellant at the January, 1927, term of the circuit court of Adams county. Appellee filed its declaration consisting of seven counts.

The first and second counts declared on a written contract dated September 15, 1924, which was set out in full in each count. Under the contract set out, the appellee agreed to deliver in about 10 weeks 25,350 catalogues printed according to certain specifications, and appellant agreed to pay therefor, $14,300, the tenth of the month following delivery.

The third, fourth, fifth and sixth counts declared on an order, without stating whether written or printed,

for 25,350 catalogues for which the appellant agreed to pay $14,300. The third and fifth counts alleged that the catalogues were shipped to and received, accepted and retained by appellant.

The fourth count alleged a compliance with the order in all respects.

The sixth count alleged that said catalogues were sold to appellant, the time of delivery was extended to include January 30, 1925, and that said catalogues were on that date shipped, and consigned to appellant at Quincy, Illinois.

The seventh count consisted of the consolidated common counts for the sum of $14,385.16, due March 10, 1925.

Pursuant to the contract, on January 30, 1925, appellee shipped 25,502 catalogues to the appellant at its plant in Quincy, and on January 31 of the same year, addressed a letter inclosing an invoice which advised of the shipment of 25,350 catalogues at the agreed price of $14,300. On February 18, appellee wrote that inasmuch as it had delivered 150 books over the amount theretofore billed, an invoice was inclosed for that number at the contract price.

On the same day appellant wrote to appellee in Chicago requesting that it send someone in full authority, "to look over the catalogues sent us," claiming they were not in accordance with the contract. In compliance with this request, one J. R. Whalen, appellee's plant superintendent or foreman, was sent by officials of appellees "to make an investigation at Quincy and find out what was wrong with the catalogues and report back to Chicago."

On February 21, Whalen arrived and examined from six to ten catalogues. He then reported back to Chicago. The next step in the dealings between the parties occurred on February 23, when appellant wrote advising of Whalen's call and examination of part of

the catalogues and calling on appellee to confirm his conversation; also requesting the return of the electrotype plates which had been shipped to appellee for use in printing the catalogues.

On February 26, appellant again wrote demanding the immediate return of the electrotypes. Before returning them, appellee sent Whalen and the witness Ohlin, its secretary and comptroller, to Quincy, March 14, 1925, to see what adjustment could be made.

The testimony as to what occurred on this visit and the conversation between the representatives of the parties is sharply disputed, appellant's witnesses stating that the representatives of appellee, after examining an armful of catalogues, agreed to reprint the entire 25,000 without additional charge and gave appellant permission to use such of the catalogues furnished as they desired to send out to the trade, also without charge. On behalf of appellee, the witness Ohlin, who was no longer connected with it at the time of trial, testified that he examined 20 to 30 books, all of which had printing defects; that he asked the Fishers, appellant's president and vice president, how they wanted to adjust the controversy, whether they wanted the books reprinted or the bad sheets removed and new ones put in; that they responded it was too late in the season, and the books couldn't be used; that the witness stated at that time he had no authority to settle the controversy, but would report back and appellant would hear from Chicago.

The witness denied saying the books would be reprinted or that appellant could use all they needed without charge and added that his offer to send trained bindery girls from Chicago to examine the books for imperfections was refused.

The only witness to this conversation outside of the representatives of the parties was the witness Schmidt, an employee of Brock & Rankin who handled the bind-

ing of the catalogues, who testified on behalf of appellant. He stated that Ohlin asked the Fishers if it would be all right to reprint the defective pages and they asked him if they could then be inserted satisfactorily. The witness rejoined that this could be done, but John Fisher said the season was practically over and since the electrotype plates had been returned, he didn't think this could be done in time; that Ohlin then suggested, "If Foley will print the whole job over again," he said, "Of course, I can't say whether they will do that or not," he said, "but if they would print the whole job over, would that be satisfactory"; so John Fisher said, "No, it is too late, as I have told you, the season is over, and we have lost our whole year's business by not having perfect books."

On March 16, Foley and Company wrote appellant requesting permission to send trained bindery girls at its expense to sort the good books from the bad, and offering to reprint the bad books at its expense or allow appellant for them, asserting that the entire order of catalogues was a fine job, and that an overrun of 400 books was printed to take care of spoilage which should have been caught in the bindery. To this letter appellant responded, March 25, refusing the offer of appellee, claiming Ohlin and Whalen had made promises and findings which the letter did not disclose, and demanding new catalogues in compliance with the contract or return of the plates, so they could be printed elsewhere.

On March 31, appellee replied by letter refusing to reprint the entire order of catalogues and asserting that appellant's refusal to permit an examination of the books was unjustifiable. The letter went on to deny that either Ohlin or Whalen had made any promises or findings inconsistent with the position taken in the letter.

This letter was unanswered, and on April 15, Foley and Company wrote that pursuant to request it was

returning the half tones and cuts and inclosed with this letter copies of the invoices of January 30 and February 18 in the amounts of $14,300 and $85.12 respectively, and demanded payment.

While these letters were passing between the parties early in 1925, and continuing down to March of 1926, appellant sent out to its trade thousands of these catalogues and between 50 and 100 truck loads, furnishing them also to its salesmen for use in calling on the trade. Many orders were received as a consequence, this being the only general stove catalogue in use by appellant for over a year.

It was established that of the 25,502 catalogues shipped, 14,143 were on hand at the time of trial and 2,828 were damaged by a fire in appellant's plant in September, 1927, leaving 8,361 as the total number shipped out by appellant to its trade despite the alleged printing defects. There is no showing in the record that this was less than appellant customarily used for a similar period or that the next catalogue was printed sooner than usual, because of the alleged defects in this catalogue No. 37.

In September, 1927, a fire occurred in appellant's plant at Quincy which practically demolished it. While claims could have been made upon the insurance companies for payment of the loss to goods held in trust, commission, consignment or storage, or sold but not delivered, appellant failed to characterize its holding of these catalogues in either of those capacities, but filed with the insurance companies sworn proofs of loss, a sample of which appears in evidence, under which appellant through its president, John J. Fisher, swore that ''Insured was the absolute and unconditional owner of the property described.'' And ''that no articles are mentioned herein or in the annexed schedules, but which were in or on the premises described, and which belonged to and were in the custody or control of Insured at the time of said fire.''

The schedules which were referred to consisted of several hundred pages of items made up from appellant's records by its auditor and insurance adjuster, and were identified as plaintiff's Exhibit 11. The page which contained the itemization of the claim for loss to these No. 37 catalogues was received in evidence as plaintiff's Exhibit 14 and indicates a claim for 14 cases of No. 37 catalogues, averaging 202 to the case, at the cost of 66¢ each, or a total value of $1,866.48. This loss which was claimed to be 100 per cent was disputed by the insurance company adjusters, and was finally settled at the sum of $622.16. At the trial, appellant conceded under a stipulation of facts that the loss claimed by it in connection with these No. 37 catalogues which it had received from appellee, was settled at the sum of $622.16, and that this sum had been received from the insurance companies.

Upon the issue of compliance with the contract, the record fails to bear out the statement that it is undisputed the catalogues were not in accordance with the agreement. The only witnesses who examined more than an armful of catalogues were Straus and W. J. Fisher, both employees of appellant, neither of whom testified as to the results of their examination, save that Fisher stated, after examining a few from six or eight cases, that he was unable to find any good ones.

The witnesses Anderson and Freeland, employees of a printing house under contract with appellant, had examined no more than 50, and Freeland admitted that printing defects would be expected to appear in a small percentage of the total run, and that this accounted for the provision in the contract as to spoilage and a 90 per cent acceptable delivery.

The so-called proof of noncompliance, then, rests not on the testimony of any witness who purports to have examined any considerable number of the books, but on admissions claimed to have been made by appellee's employees Ohlin and Whalen at their visit to

Quincy March 14, upon examination of not more than 30 books of a possible 25,000. In answer to this, it should be noted that on rebuttal, Ohlin testified that neither he nor Whalen characterized the job as ''rotten,'' but that the few books he looked at had certain printing defects, and that he suggested sending down a crew of bindery girls in order to make an examination so as to determine how many of the books were unfit for use.

This offer was refused by appellant so that Foley & Company never had an opportunity to make a complete examination of the catalogues.

There was a trial by jury and a verdict and judgment in behalf of appellee in the sum of $12,500, and appellant has brought the record to this court, by appeal, for review.

Appellee, on the trial, offered exhibits, proofs of loss made by appellant as to destruction of catalogues by fire, made under oath and affirming that the catalogues were the sole property of appellant. Appellant complains because the court refused to admit in evidence the entire policies, which authorized appellant to make claim for supplies as ''their own or held by them in trust or on commission.''

The fact that claim could have been made for loss to the goods of others is entirely immaterial in the face of the fact that to induce the insurance companies to pay the loss, appellant swore the goods were its own; that it was the absolute and unconditional owner and made its claim based upon a valuation of 100 per cent of the cost price; that this claim was adjusted at $622.16, and this amount was paid over by the insurance companies without any knowledge that the catalogues were claimed to be the property of others, and that payment had been refused because of printing defects.

On the adjustment of this claim for $1,866.48, it appears that the final basis of agreement was that

the catalogues were considered to have only 50 per cent of their invoice value or $933.24, because of age, and the loss was agreed upon as two-thirds of their actual value, namely $622.16. There was no error in not admitting the policies in evidence.

Neither was it error in refusing to permit appellant to introduce records, made upon its own books, by its employees, at the direction of appellant, which were never brought to the attention of the insurance companies. The testimony was self-serving and of no probative force. (*Wright v. Raftree,* 181 Ill. 464; *Gray v. Morey,* 57 Ill. 221; *E. H. Bindley & Co. v. Watson,* 151 Ill. App. 123.)

It is insisted by appellant that there was no basis for the jury's finding and that it should have been $18,659.28 or nothing.

There were 14,143 catalogues on hand with an invoice price of 66¢ each. Appellee showed by the testimony of the witnesses Mehagen and Nelson, the insurance adjusters, that in making the adjustment on these catalogues it was agreed between them and the Fishers that the value was 50 per cent of the invoice price. The jury in reaching their verdict doubtless assumed that even if there was cause for complaint on the part of appellant in the alleged printing defects, having agreed with the insurance companies upon a 50 per cent valuation for the purpose of adjusting the fire loss, this would be considered as an admission the catalogues were worth that much for all purposes.

Half the catalogues on hand or 7,071, at 66¢ amounts to $4,666.86, which leaves a debt after deduction from the invoice price of $14,385.12, in the amount of $9,718.26, as of February 10, 1925. Interest on this sum for six years would be $2,915.46, or a total of $12,633.72. Since the case was tried in the January, 1931, term, or somewhat less than six years after the debt was due, it is easy to see how the jury could have arrived at its verdict of $12,500.

Moreover, if there was an acceptance of the catalogues, and if appellee was entitled to recover the full amount of its claim, certainly appellant is in no position to complain that the verdict should have been substantially higher.

It is next contended by appellant that the evidence shows the catalogues furnished were inferior in quality and workmanship and numerous pages of the abstract and record are quoted as authority therefore, but upon examination they prove not to bear out this contention. The references to pages of the abstract consist of remarks attributed to Ohlin, appellee's comptroller, after examining 30 books, that the job was a "bum one."

This statement was denied.

The witness Schmidt stated that when the sheets came in for binding, he noticed they were torn, and the paper was not up to sample. So far as the torn sheets are concerned, there is nothing of record to show how many were torn or whether the books containing these torn sheets were shipped to Quincy, or that if they were, this resulted in spoilage of over 10 per cent of the total number. The contract, it will be remembered, provides that 90 per cent of the order shall be considered an acceptable delivery, and Foley and Company printed an overrun of 400 books to take care of any spoilage.

The witness Freeland, an office employee of a competitive publishing house, testified that the paper in the books was of a lower quality than the sample in evidence and that one of the catalogues contained certain printing imperfections. The contract in writing provided that the paper used should be 70 pound white enamel, a common type of paper used in printing. Nowhere is it denied that the paper was of this quality, and in view of the fact that no sample is referred to in the contract, the court should not have received it in evidence. In any event, it is undisputed that the

paper stock was 70 pound white enamel and Freeland's testimony at best refers only to a scanty number of the books. There is no support in the testimony of the charges made.

Complaint is made that the court refused to admit in evidence the statements made by the witness Whalen when he went to Quincy. The authority of the witness Whalen, when he was sent to Quincy by appellee, was expressly limited to securing information and investigation and reporting back. Whalen was plant superintendent for appellee and had no authority to speak or negotiate for appellee. Any statement that he made was not binding upon appellee. No tender of proof was made as to what this witness would testify to, and there was, therefore, no error. (*Chicago City Ry. Co. v. Carroll*, 206 Ill. 318, 328; *Strong v. Friedman*, 261 Ill. App. 602, 618; Wigmore on Evidence, 2d Ed., vol. 3, sec. 1769.)

There was some testimony offered quoting Whalen and Ohlin that the catalogues could be used without charge and that appellee would reprint. Under no theory could this promise be held as binding on appellee for Whalen was merely a plant superintendent or foreman, and not an official of the corporation, and as such, had no implied authority to make any promise binding upon appellee. Fletcher Cyc. Corp., vol. 3, p. 3271, and numerous cases there cited.

Moreover, his authority was expressly limited by instructions from the company's president and general manager, who wrote, upon being apprised in the letter of March 25, that findings and promises were claimed to have been made by Whalen and Ohlin, denying any such promises or findings, and stating the findings were exactly as set forth in appellee's letter of March 16. Ohlin flatly denied that any such conversations took place.

Appellant further contends that the court erred in giving plaintiff's instructions Nos. 8, 9, 10, 11, 12, and

13, and in failing to give defendant's instructions Nos. 33 and 34. Appellee's given instructions objected to are as follows:

"No. 8. The jury is further instructed that if it finds from the evidence that the plaintiff delivered to defendant catalogues in accordance with the contract, in the number specified by the contract taking into account the 10 per cent clause, then you must find the issues in favor of the plaintiff and assess plaintiff's damages at the contract price of said catalogues plus interest on said amount at the rate of 5 per cent per annum from March 10, 1925, to the present date, less freight charges so far as the same is shown by the evidence.

"No. 9. The jury are further instructed that if you believe that the defendant did any act with respect to the said catalogues, without the consent or direction of the plaintiff expressed or implied, which the defendant would have had no right to do unless the defendant were the owner of the catalogues, they should find that the defendant in law and in fact accepted said catalogues, any actual intention to the contrary on the part of the defendant is wholly immaterial.

"No. 10. The court instructs the jury that in law defendant is deemed to have accepted the catalogues if after receiving the catalogues it has done any act in relation to them which is inconsistent with ownership in the plaintiff, or retained the catalogues in its possession an unreasonable length of time without permission or consent of the plaintiff; even though the catalogues were not printed in accordance with the contract.

"No. 11. The jury is instructed that if the catalogues were not in accordance with the specifications and terms of the contract, the defendant to relieve himself of the obligation to pay therefor, might have refused to take delivery of them or if defendant took

delivery, it might have within a reasonable time thereafter, rescinded the contract by returning or offering to return the catalogues to the plaintiff unless the catalogues were entirely worthless; the defendant cannot accept part of the catalogues and reject another part, but any such rescission must be of the whole of the catalogues.

"No. 12. The court instructs the jury that if it finds from the preponderance of the evidence that after the delivery of the catalogues the defendant used them as its own but that such use was with the permission and consent of the plaintiff, but further finds from a preponderance of the evidence, that after the giving of such consent and permission the plaintiff withdrew its consent and permission for defendant to use said catalogues as its own by demanding the contract price therefor and further find from a preponderance of the evidence that after the withdrawal of such permission and consent the defendant continued to act towards and use said catalogues in a manner inconsistent with the ownership in the plaintiff, then such acts and use by the defendant constituted acceptance of the catalogues and you should find the issues in favor of the plaintiff and assess damages at the full contract price and add thereto interest at the rate of 5 per cent per annum from March 10, 1925, to the present time, less freight charges, so far as the same are shown by evidence.

"No. 13. The court instructs the jury that the burden is on the defendant of proving its set off by the preponderance or greater weight of the evidence, and if you believe the evidence on the defendant's set off is evenly balanced, or preponderates in favor of plaintiff then you should find as to that issue in favor of plaintiff, Foley and Company."

In *American Theater Co. v. Siegel-Cooper & Co.*, 221 Ill. 145, it appeared that 600 opera chairs, "K. D." flat, were ordered in writing in accordance with a

sample submitted. The chairs were delivered and set up in defendant's theater. The declaration consisted of the common counts. The court directed a verdict for the plaintiff, and the contention was made in the Supreme Court, after affirmance of the judgment by the Appellate Court, that the plaintiff had failed to prove the chairs delivered complied with the description contained in the contract. The Supreme Court held this to be unnecessary, in view of the proof that the defendant had received and retained the chairs and had set them up in his opera house for use, and held as follows, page 147: "With this proof in the record, it was not necessary for appellee to prove that the chairs exactly corresponded with the sample or with the description contained in the contract. The law does not permit a person to receive goods under a contract, appropriate them to his own use, and then defeat an action for the purchase price on the ground that the goods were not of the exact quality or description called for by the contract."

It will be noticed that in this case the only evidence offered by the plaintiff was that the chairs delivered were K. D. opera chairs, with iron frames and upholstered backs, corresponding to the proof in the instant case that the catalogues delivered were National Stove catalogues.

To the same effect is *Hommel Wine Co. v. Netter,* 197 Ill. App. 382, and *Waukesha Canning Co. v. Henry Horner & Co.,* 138 Ill. App. 564, and indeed, this rule of law appears to be based on sound principle, for if the goods tendered in pursuance of the contract are received and used by the vendee with knowledge of their condition, to require the vendor to make proof of quality and compliance with the *contract conditions,* would tend to make of every lawsuit in which the facts are practically undisputed a complicated and difficult procedure.

The objection to appellee's instruction number 8 could equally apply to appellant's instruction number 19, as each is based upon the same principle and present the same rule, as applied to each side of the case. As to instructions numbers 9 and 10, there can be little doubt as to their propriety, as the principle enunciated therein that any act done by the defendant which it would have no right to do unless the owner of the catalogues, would amount to an acceptance of the delivery, has been approved in many cases and is part of the Uniform Sales Act, Cahill's Ill. Rev. St. ch. 121a, ¶ 51. *Wolf Co. v. Monarch Refrigerating Co.,* 252 Ill. 491.

.We are unable to agree with appellant's construction of plaintiff's given instruction number 11. This instruction was more than fair to appellant, for it indicated the action which might have been taken by it to relieve itself of liability without indicating that such action had not been taken. As to the contention that this instruction advised the jury that defendant had accepted part of the catalogues and endeavored to refuse the remainder, there was ample undisputed evidence that appellant had accepted at least part of the catalogues by claim for their loss in the fire as the absolute and unconditional owner. It has been held in this State that including goods received by vendee in his proofs of loss for insurance upon his stock amounts to an acceptance. *Telford v. Albro,* 60 Ill. App. 359.

In addition, over 8,000 were mailed to the trade after withdrawal by appellee of any alleged permission to do so. This being the case, the question arises whether appellant could accept part and reject the balance of the shipment, it being clearly established that there was a partial acceptance. Under the usual definition, we submit it is apparent the contract was indivisible. "A contract is entire, when, by its terms, nature and purpose, it contemplates and intends that each and all of its parts and the consideration shall be common

each to the other and interdependent.'' 13 Corpus Juris 561; *Bank of Antigo v. Union Trust Co.,* 149 Ill. 343. Being indivisible and entire the vendee has no right to accept part and reject the rest. (*Wolf v. Dietzsch,* 75 Ill. 205; *Steinberg v. Schwartz,* 219 Ill. App. 138.) It follows then that these instructions both correctly stated the law and were supported by the evidence.

It is claimed that appellee's instruction number 12 improperly assumed there was evidence that the appellee had withdrawn permission previously given to use the catalogues in question. Bearing upon this point are the letters of March 31 and April 15, written by appellee and stating appellee's refusal to reprint the catalogues and demanding payment of the bill on the theory that there had been a compliance with the contract.

Even going so far as to assume that Ohlin and Whalen were authorized to and did give permission to appellant to ship out such books as they needed, without charge, there is no evidence whatever of any consideration received by appellee for the alleged promise such as to constitute the arrangement a contract. This being so, it was a mere permissive use, and appellee served notice that it considered it was not in default and would not reprint, and demanded payment of the bill on the theory that it had performed.

Moreover, under appellant's given instructions numbers 22 and 23, appellant was fully protected through the advice to the jury that if the use was by agreement with the plaintiff, such use would not of itself constitute an acceptance.

There was no error in giving appellee's instruction number 13 as it was expressly limited to a set-off and appellant's instruction number 17 was to the same effect.

As to defendant's refused instruction number 33, this was properly refused, for it limited the jury in determining whether there had been an acceptance to an examination of what the parties did, whereas the

court had given on behalf of appellant its instruction number 18, which instruction advised the jury upon this question of acceptance to take into consideration all the facts and circumstances surrounding the delivery of the catalogues as shown by the evidence, and from such facts and circumstances and all the facts and circumstances in evidence, determine whether there was an acceptance by the defendant.

The real vice in instruction number 33 is that the jury is to consider only what the parties did as determining their intentions. Since an acceptance may be predicated upon failure to do anything where there is a duty to act, this instruction did not correctly state the law. In view of the giving of defendant's instructions numbers 18, 22 and 23, it appears that the jury was fully instructed upon this question of acceptance.

Construing all of the given instructions as a whole, it is apparent that the law applicable to the facts was properly presented to the jury.

The further point is made that there can be no recovery on the pleadings for the reason that the contract was not performed, and that appellee should have pleaded an excuse for nonperformance.

This objection was not raised on the motion for a new trial and therefore must be considered as waived.

In support of this point are cited cases involving suits on insurance policies and building contracts, under which conditions precedent are set forth which must be complied with before a cause of action accrues. In such cases, it is doubtless true that there is no cause of action without showing performance of the condition precedent or an excuse for nonperformance. Generally, it is true that what must be proved must also be alleged as a part of proper pleading. The essential difference between this principle and the case at bar lies in the fact that there is no condition precedent in the contract in evidence, nor can acceptance be considered an excuse or waiver of nonperformance.

The theory of acceptance is that it constitutes an admission of performance such as dispenses with proof thereof. (*American Theater Co. v. Siegel-Cooper Co.,* 221 Ill. 145; *Hommel Wine Co. v. Netter,* 197 Ill. App. 382.) In the latter case, which involved a claim to recover for wine, a portion of which was sold by vendee after delivery, and the balance claimed to be not in compliance with the contract, the court on page 391 affirmed the language of *Eureka Cast Steel Co. v. Morden Frog Works,* 23 Ill. App. 591: "that, in the absence of fraud or latent defects, the acceptance of an article sold upon an executory contract after an opportunity to examine it, amounted to an agreement that the article conformed to the contract and was satisfactory."

From these cases, it clearly appears that, quite the contrary to considering an acceptance as tantamount to an excuse for nonperformance, the courts were of the opinion that it amounted to a representation of full compliance with the contract to the vendee's satisfaction.

Some complaint was made as to the court's refusal to admit in evidence one telegram received by appellant and a copy of a telegram sent by appellant. What we have said about the Whalen and Ohlin testimony answers all criticisms as to the court's ruling upon these proffered exhibits. They could have affected the result of the suit in no manner and were not competent.

Under all of the undisputed proof in this case appellee was fully entitled to a verdict and judgment in a larger amount than that entered, and there is no error pointed out in the record that would warrant a reversal of the judgment. (*Catholic Bishop of Chicago v. Bauer,* 62 Ill. 188; *Concord Apartment House Co. v. O'Brien,* 228 Ill. 360.)

Accordingly, the verdict and judgment of the circuit court of Adams county is affirmed.

*Affirmed.*